UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

L & LEUNG LEATHERWARE LIMITED,

                Plaintiff,

     -against-

COLLECTION XIIX LTD. et al.,

                Defendants.

----------------------------------------------------------------

17 Civ. 7374 (DAB)

**MEMORANDUM OF LAW  IN SUPPORT OF MOTION TO DISMISS PURSUANT TO
NEW YORK BUS. CORP. LAW § 1312, RULES 17(B), 12(B)(1) AND 12(B)(6) OF
<u>COLLECTION XIIX LTD. AND LISA NUNZIATA</u>**

Brett Berman, Esq.
Elizabeth Viele, Esq.
FOX ROTHSCHILD LLP
101 Park Ave, Suite 1700
New York, NY 10178

*Counsel to Defendants Collection
XIIX, Ltd. and Lisa Nunziata*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................ 1

FACTS ................................................................................................................................ 3

I.     L & Leung Has Been Doing Business in New York Since 2004 ...................................... 3

II.    Metamorphosis was Formed for the Sole Purpose of Conducting Business in New York as an Agent of L & Leung.......................................................................................... 4

III.   L & Leung Conducted Business Activities Directly in New York on a Regular Basis...... 8

       1.     L & Leung Maintained Retail Accounts in the New York That Its Authorized Representatives Handled in the New York City Office......................................... 8

       2.     L & Leung Had Employees in New York and Advertised for Employees in New York ...................................................................................................... 10

IV.   L & Leung Is Not Authorized To Do Business in New York ......................................... 10

ARGUMENT ...................................................................................................................... 11

I.     The Court Has Authority to Dismiss The Complaint Pursuant to Section 1312 and Federal Rules of Civil Procedure 17(b) and 12(b)....................................................... 11

II.    L & Leung Was Doing Business In New York Within the Meaning of Section 1312..... 13

       1.     Leung Was Engaged In Systematic and Continuous Business Activities Through Its Agents .......................................................................................... 14

       2.     Leung Was Directly Engaged In Systematic and Continuous Business Activities in New York......................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alicanto. S.A. v. Woolverton*,
129 A.D.2d 601, 514 N.Y.S.2d 96 (2d Dept. 1987) ................................................13

*Angel v. Bullington*,
330 U.S. 183 (1947)................................................................................................12

*Conklin Limestone Co., Inc. v. B.A. Linden*,
22 A.D.2d 63 (3d Dept. 1964) ...............................................................................17

*Dixie Dinettes, Inc. v. Schaller's Furniture, Inc.*,
71 Misc.2d 102, 103 (King C'ty 1972) ..................................................................11

*Fashion Fragrance & Cosmetics v. Croddick*,
2003 WL 342273 (S.D.N.Y. 2003)...................................................................17, 18

*Highfill, Inc. v. Bruce & Iris, Inc.*,
50 A.D.3d 742, 855 N.Y.S.2d 635 (2d Dept. 2008) ....................................13, 17, 18

*Hongtai Trading Inc. v. Mingshen Yan*,
2013 WL 1788541 (E.D.N.Y. Apr. 26, 2013) ...........................................12, 15, 16

*Mayatextil SA v. Liztex USA*,
1993 WL 51094 (S.D.N.Y. Feb. 24, 1993)........................................................12, 13

*Mindy Weiss Party Consultants, Inc. v. Carl*,
285 F.Supp. 3d 560 (E.D.N.Y. 2018) .....................................................................16

*Netherlands Shipmortgage Corp., Ltd. v. Madias*,
717 F.2d 731 (2d Cir.1983).................................................................................11, 13

*Paper Manuf'rs Co. v. Ris Paper Co. Inc.*,
86 Misc.2d 95 (N.Y. C'ty 1976) .............................................................................17

*Parkwood Furniture Co., Inc. v. OK Furniture Co.*,
76 A.D.2d 905 (2d Dept. 1980) .....................................................................14, 15, 16

*Remsen Partners, Ltd. v. Southern Mgmt. Corp.*,
2004 WL 2210254 (S.D.N.Y. Sept. 2004)..............................................................12

*Scaffold-Russ Dilworth, Ltd. v. Shared Mgmt. Grp., Ltd.*,
256 A.D.2d 1087 (4th Dept. 1998) ........................................................................17

*SD Protection, Inc. v. Del Rio*,
  498 F.Supp.2d 576 (E.D.N.Y. 2007) ........................................................................12

*Woods v. Interstate Realty Co.*,
  337 U.S. 535 (1949)................................................................................................12

**Statutes**

New York General Business Corporation Law §1312 ........................................... *passim*

**Other Authorities**

Federal Rules of Civil Procedure 17(b) .........................................................................12

Federal Rule of Civil Procedure Rule 12(b)(1)...........................................................12

Federal Rule of Civil Procedure Rule 12(b)(6)......................................................12, 13

<u>**PRELIMINARY STATEMENT**</u>

Under New York General Business Corporation Law §1312 ("Section 1312"), a "foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state."  N.Y. Bus. Corp. Law § 1312.

L & Leung Leatherware Limited ("L & Leung") is a foreign handbag manufacturing company that engaged in significant and continuous business activities in the state of New York for over a decade without authorization to do so.  L & Leung, a Hong Kong corporation, carried out its enterprise in two ways: first, through the use of corporations that were created for the sole purpose of growing L & Leung's business in New York and the United States and second, through direct business activities in New York City with customers.  These business activities commenced in the early 2000s and remained active through 2017, in and around the time the instant complaint was filed.  Despite this level of sustained and active business in New York, L & Leung has not become authorized to do business in the state as required by Section 1312.  As such, L & Leung is not entitled to maintain the current action and this matter should be dismissed.

L & Leung has systematically transacted business in New York using a variety of methods.  As set forth above, L & Leung used shell corporations, which were financed by and under the complete control of L & Leung, to allow the foreign company to take advantage of New York markets.  New York courts have found that this use of agents constitutes "doing business" under Section 1312.  L & Leung cannot escape the requirements of Section 1312 merely because it set up another in-state company to conduct its own business transactions.

L & Leung rented a show room and office space on Fifth Avenue in New York City for almost 15 years and utilized a company, Metamorphosis, which was created for the sole purpose

1

of acting as sales agent for L & Leung's United States business, which constituted almost 100% of L & Leung's sales.  In exchange, L & Leung funded the operating expenses, salaries, rent and other costs for Metamorphosis.  From its New York City space, Metamorphosis would solicit buyers to review handbag samples and develop products every season, four times a year, for which customers would then place purchase orders.  All of L & Leung's customers in the United States came to the New York City office to work with Metamorphosis prior to placing their purchase orders.  Monies from these sales were paid directly to L & Leung, which then returned part of the proceeds to Metamorphosis to pay for its rent, salaries, commissions and other operating expenses.

Lisa Nunziata ("Nunziata"), the half-owner of Metamorphosis along with Andrew Leung, served as the company's president and was tasked with design, marketing and sales of product and overall management of the New York and United States business.  Nunziata, as well as other Metamorphosis employees, had full authority to act on behalf of L & Leung with customers.

In addition to L & Leung's business activities in New York through Metamorphosis, L & Leung directly and independently did business in the state with customers for a number of years and up through 2017.  For these customers, L & Leung authorized individuals in New York to act as L & Leung representatives and to facilitate sales on its behalf.  These sales were handled completely separately from other customer accounts run by Metamorphosis and the monies from these sales were not cycled back to Metamorphosis for its operating expenses.  L & Leung was making shipments to and receiving purchase orders and correspondence from Dillard's as late as 2017 and had authorization from Dillard's to import goods through 2018.  In order to carry out this business, L & Leung also hired (and advertised for) employees that were paid directly by L

2

& Leung and worked only on L & Leung business, as opposed to Metamorphosis employees

who worked on L & Leung sales as agents, but sat in the New York City office space.

Finally, L & Leung executives Andrew Leung, managing director of L & Leung, as well

as his son, Mark Leung, executive director of L & Leung, would travel to New York on a regular

basis to work with Metamorphosis and L & Leung employees and to engage with customers.

L & Leung's systematic business activities in the state of New York, without

authorization to do business in the state as a foreign corporation, is a violation of Section 1312

and renders them without legal capacity to sue.  The purpose of Section 1312 is to require

foreign corporations to pay the same fees and taxes that domestic corporations, so as not to allow

an unfair advantage to unregistered entities.  To allow L & Leung to maintain this suit, without

the company having become authorized to do business in New York in almost fifteen years,

flouts the very purpose of the statute.  Accordingly, this Court should dismiss the Complaint with

prejudice.

## FACTS

### I.   L & Leung Has Been Doing Business in New York Since 2004

L & Leung is a manufacturer of ladies' handbags.  *See* Declaration of Elizabeth Viele

("Viele Dec."), Ex. 1 (excerpts of Deposition of Andrew Leung), 12:9-18.  L & Leung is

incorporated in Hong Kong and owned in equal fifty percent shares by Andrew Leung, the

company's managing director, and his wife.  *See* Complaint, ¶ 2; Viele Dec., Ex. 1, 6:3-23; 7:19-

21; 8:21-24.

L & Leung had been conducting business within the state of New York since at least

2004 through agent companies operating out of an office space in show room on Fifth Avenue in

New York City up until 2017.  *See* Declaration of Lisa Nunziata ("Nunziata Dec."), ¶ 8.  In

March 2004, Lee & Alfred, a company wholly owned by L & Leung, signed a five year lease for

an office space and show room at 320 Fifth Avenue to stay in the space until February 2009.  *See*
Viele Dec., Ex. 2 (Lease for 320 Fifth Avenue); Ex. 1, 15:13-16:8; 19:10-24.  Lee & Alfred
conducted handbag sales for its parent company, L & Leung, in New York.  *See* Viele Dec., Ex.
1, 15:13-16:8; 19:10-24.

In 2006, Andrew Leung and Nunziata started working together in a business partnership.
*See* Viele Dec., Ex. 3 (excerpts of Deposition of Lisa Nunziata), 13:5-18; *see also* Nunziata Dec.,
¶ 2.  In the partnership, Nunziata's role was to design, develop, sell and market leather handbags
and Andrew Leung's role was to manufacture the products.  *See* Viele Dec., Ex. 3, 13:19-14:2;
*see also* Nunziata Dec., ¶ 3.  Andrew Leung attempted to fulfill his end of the partnership
through L & Leung, which owned a factory in China.  *See* Viele Dec., Ex. 1, 11:11-22; *see also*
Nunziata Dec., ¶¶ 4-5.

## II.    Metamorphosis was Formed for the Sole Purpose of Conducting Business in New York as an Agent of L & Leung

In 2009, Andrew Leung and Lisa Nunziata formalized their business relationship through
the formation of a company, Metamorphosis, the sole purpose of which was to conduct sales and
grow L & Leung's business in New York and the United States.  *See* Viele Dec., Ex. 1, 33:21-
34:4; *see also* Ex. 4 (Shareholder Agreement); Ex. 5 (Management Agreement dated October 2,
2009); Nunziata Dec., ¶ 6.  Metamorphosis was created specifically to act as a sales agent,
among other things, for L & Leung and was based in the New York City office and showroom at
320 Fifth Avenue.  *See* Nunziata Dec., ¶ 7.  Nunziata, through Metamorphosis, designed,
developed, marketed and sold handbags for only L & Leung.  *See id*., ¶ 19.  L & Leung was
100% of Metamorphosis' business.  *See id*.  New York customers represented a majority of
Metamorphosis', and therefore L & Leung's business, and L & Leung, was dependent on its
agents for its livelihood as a company.  *See id*., ¶ 21-22.

4

As set forth in the Shareholder Agreement, Lisa Nunziata was described as "residing at 320 Fifth Avenue," the address of the New York City office space in which Lee & Alfred had signed the lease and which Metamorphosis was going operate out of to conduct sales and transact business for L & Leung.  *See* Viele Dec., Ex. 4, LL000007.  Metamorphosis took over the lease and stayed in the space from February 2009 to in or around July 2017.  Viele Dec., Ex. 1, 26:24-27:11; Ex. 6 (Notice of Petition for Holdover Summary Proceeding Commercial).  Metamorphosis was owned in equal fifty percent shares by Andrew Leung and Nunziata.  *See* Viele Dec., Ex. 4, LL000007.  Thus, L & Leung and Metamorphosis had common ownership through Andrew Leung.

The Management Agreement contains numerous admissions that L & Leung was taking active steps to establish its business in New York through the formation of Metamorphosis.  The agreement expressly states that:

- "Lisa agrees to manage L & L's operation [sic] in USA and represent the business transactions of this operation in the interest of L & L;" (LL000010)

- "L & L's US operation currently locates [sic] at Suite 600, 320 5th Avenue, New York, 10001, NY USA;" (LL000011)

- "commercial invoice" is  an "invoice(s) delivered by L & Leung Hong Kong or US office to a customer…;" (*id.*) and

- "Lisa agrees to serve as vice president of L & Leung's US office, and represent L & L for its commercial matters regarding its brand and private label business and general administration in the US." (*id.*)

Viele Dec., Ex. 5.

Though the Management Agreement refers to Lisa as vice president, she actually held the title of president and was held out as such on Metamorphosis and L & Leung materials.  *See* Viele Dec., Ex. 7 (Page of the L & Leung website); Nunziata Dec., ¶ 9.

The New York City office is referred to as the "US Office" throughout the Management Agreement.  *See* Viele Dec., Ex. 5.  Based on the language of the agreement, L & Leung clearly viewed the New York City office as merely an extension of its Hong Kong headquarters and expressly gave Nunziata authority to act on L & Leung's behalf in business dealings in New York and the United States.

As president, Nunziata's job was to work out of the New York City office and design handbags and make sales to New York customers and other customers in the United States for L & Leung.  *See* Nunziata Dec., ¶ 9.  Nunziata received commission and salary from L & Leung for sales she made.  *See id.* at ¶ 10; *see also* Viele Dec., Ex. 5, LL000012.  All of L & Leung's United States customers travelled to the New York City office to view samples and develop products prior to making their purchase orders.  *See* Nunziata Dec., ¶ 20.  Customers came to New York approximately once a season for a total of four times a year every year up through 2017.  *See id.*

The business structure between L & Leung and Metamorphosis further supports the notion that L & Leung was directly conducting business in the state of New York and that Metamorphosis was merely an agent with no independent business function.  For example, all customers in New York and in the United States placed their purchase orders through Metamorphosis, but the purchase orders were made out in the name of L & Leung.  *See* Viele Dec., Ex. 1, 55:3-6; *see also* Nunziata Dec., ¶ 13.  Also, all monies from sales to customers in New York and in the United States were either (1) received by Metamorphosis in New York in U.S. dollars but then paid directly to the L & Leung HSBC bank account in New York or (2) paid to L & Leung's bank account via direct deposit from customers.  *See* Nunziata Dec., ¶ 15. In other words, all monies resulting from sales to Metamorphosis flowed directly to L & Leung.

*See* Viele Dec., Ex. 1, 55:7-10.  With the exception of a very few individual orders,

Metamorphosis never had title to any of the goods manufactured at its request or purchased by its

customers.  *See* Viele Dec., Ex. 8 (excerpts of Deposition of Yasser Hafeez), 63:17-64:8.

      L & Leung controlled Metamorphosis.  Because Metamorphosis did not receive any

customer monies, Metamorphosis was dependent on L & Leung to cover reimbursement for its

expenses.  *See* Viele Dec., Ex. 1, 58:17-23; *see also* Nunziata Dec., ¶ 16.  This arrangement was

set forth in the Management Agreement and consistent with the parties' intent when forming

Metamorphosis.  *See* Viele Dec., Ex. 5; Ex. 1, 39:3-6.  In order to run the New York City office,

Metamorphosis incurred costs including employees and staff salaries, rental payments, mail and

shipping costs, and entertainment expenses.  *See* Viele Dec., Ex. 1, 55:23-56:16.  On a monthly

basis, Metamorphosis would provide a list of salary and expenses to L & Leung, which would be

reviewed by L & Leung in Hong Kong.  *See* Viele Dec., Ex. 8, 4:2-16:25; *see also* Nunziata

Dec., ¶ 16.  L & Leung would then forward Metamorphosis funds in New York to pay its

approved expenses from the monies paid by customers for their purchase orders.  *See* Viele Dec.,

Ex. 1, 58:24-59:20; *see also* Nunziata Dec., ¶ 16.  L & Leung would send funds via check or

wire transfer to Metamorphosis' Chase bank account in New York.  *See* Nunziata Dec., ¶ 17.  In

addition, L & Leung excluded Metamorphosis from all financial information regarding the

production of handbags, including cost breakdowns of manufacturing and price negotiations with

suppliers.  *See id.*, ¶ 18.

      L & Leung sent its executives from Hong Kong, including Andrew Leung and Mark

Leung, L & Leung's executive director, approximately once a year to handle matters related to L

& Leung's New York sales through Metamorphosis.  *See* Viele Dec., Ex. 9 (excerpts of

Deposition of Mark Leung), 4:9-15; *see also* Nunziata Dec., ¶ 23.  Mark Leung, for example,

met with customers in the New York City office.  *See* Viele Dec., Ex. 9, 17:24-18:5.  L & Leung also sent employees from the Hong Kong offices to the New York City office to work on and develop processes by which the business would operate, as well as to solicit customers and take orders.  *See* Viele Dec., Ex. 9, 119:16-120:1; *see also* Nunziata Dec., ¶ 24.

Metamorphosis was actively engaged in obtaining sales and doing business on L & Leung's behalf and for its benefit in and around the time the complaint was filed.   Despite L & Leung's claims that it did not do any business in New York, L & Leung was the "vendor of record" name and given the vendor number for all of the customer accounts that Metamorphosis handled.  *See* Nunziata Dec., ¶ 14.

Nunziata was expressly authorized to act on behalf of L & Leung, as set forth in Management Agreement and as admitted by Andrew Leung.  *See* Viele Dec., Ex. 5, LL000011; Ex. 1, 46:13-47:5; 48:11-24; *see also* Nunziata Dec., ¶ 11.  She was authorized to sign contracts and other documents on behalf of L & Leung and L & Leung's parent company, L & Leung Handbags Mfy Ltd.  *See* Viele Dec., Ex. 10 (River of Colors License Agreement); Ex. 11 (Mediocre Corporation Supplier Agreement); *see also* Nunziata Dec., ¶ 12.

### III.    L & Leung Conducted Business Activities Directly in New York on a Regular Basis

In addition to the business activities conducted by L & Leung's sales agent in New York Metamorphosis, L & Leung directly and independently did business in the state for a sustained period of time leading up to the time this action was commenced.

#### 1.    L & Leung Maintained Retail Accounts in the New York That Its Authorized Representatives Handled in the New York City Office

L & Leung had at least two customer accounts, Belk and Dillard's department stores, which it engaged in direct business transactions in within the state of New York on a regular basis.  *See* Nunziata Dec., ¶¶ 25-26.

In order to maintain the Dillard's account and starting in approximately 2012 through 2017, L & Leung gave authority to at least two Metamorphosis employees, Nunziata and Brenda Kaneday ("Kaneday"), to act on behalf of L & Leung work with Dillard's buyers, who would travel to the New York City office multiple times a year to place orders with L & Leung. *See id.*, ¶¶ 27-29, 36. The L & Leung agents showed the buyers samples, worked with them to develop product and placed orders for them. *See id.*, ¶28. Similarly, Nunziata and Kaneday worked with Belk buyers who came to the New York City office to review samples and develop products. *See id.*, ¶ 32.

The Belk and Dillard's accounts were different than the other accounts facilitated by Metamorphosis on behalf of L & Leung because the monies never passed through Metamorphosis and were not used by L & Leung to pay monies back to Metamorphosis for its expenses. *See id.*, ¶¶ 30-31, 33-35. The Belk and Dillard's sales were completely separate from Metamorphosis and were handled by individuals working solely on behalf of L & Leung. *See id.*

L & Leung was actively engaged in maintaining these accounts in and around the time the complaint was filed. For example, L & Leung processed a Dillard's purchase order, arising out of business transacted in the New York City office, for late 2016 to be shipped in early 2017. *See* Viele Dec., Ex. 12 (Dillard's Purchase Order). In February 2017, L & Leung received an Import Authorization Letter from Dillard's authorizing it to import merchandise through March 2018, also arising out of business transacted in the New York City office. *See* Viele Dec., Ex. 13 (February 6, 2017 Letter from Dillard's to L & Leung). Further, Mark Leung confirmed that as late as July 2017, L & Leung was shipping handbags into the United States. *See* Viele Dec., Ex. 9, 141:10-23. As set forth above, all purchase orders fulfilled by L & Leung originated out of buyer meetings in the New York City office space.

   2.  **L & Leung Had Employees in New York and Advertised for**
        **Employees in New York**

  L & Leung had an employee, Alan Etkin, in the New York City office for approximately

six years.  *See* Declaration of Alan Etkin ("Etkin Dec."), ¶¶ 2-4.  Etkin performed sales activities

for L & Leung by soliciting handbag distributor companies, primarily located in New York and

the tri-state area, to use L & Leung as their manufacturer.  *See id*., ¶ 3.  Etkin worked directly on

behalf of L & Leung with approximately six to twelve customers on year. *See id*., ¶ 5.

  Etkin was paid a salary directly by wire from L & Leung on a monthly basis for his work.

*See id*., ¶ 6.  He was employed pursuant to a contract which permitted to work only with L &

Leung during his employment.  *See id*., ¶ 7.  Though L & Leung had final say in terms of

pricing, Etkin had authority to negotiate directly with customers on the terms of their orders.  *See

id*., ¶ 8.

  Executives of L & Leung, including Andrew Leung and Mark Leung, came to the New

York City office approximately once or twice a year to perform business activities on behalf of L

& Leung with Etkin directly.  *See id*., ¶ 9.  During other times, Etkin engaged in frequent email

and phone communications with Mark Leung.  *See id*., ¶ 10.

  In addition, L & Leung advertised for a new VP of Sales and Marketing to employ in

New York in and around August 2017.  *See* Viele Dec., Ex. 9, 143:9-144:4; *see also* Nunziata

Dec., ¶ 38.  Though L & Leung did not ultimately hire an employee, it is clear the foreign

company took active steps to continue its business activities in New York.

**IV.**  **L & Leung Is Not Authorized To Do Business in New York**

  L & Leung was not registered to do business in New York at the time of the filing of the

complaint.  *See* Viele Dec., ¶ 2.  To date, a search for "Leung" on the New York Department of

State website does not retrieve any results for L & Leung Leatherware Limited.  *See* Viele Dec., Ex. 14 (NYS Department of State Division Corporations Search Results for "Leung").

## ARGUMENT

**I.    The Court Has Authority to Dismiss The Complaint Pursuant to Section 1312 and Federal Rules of Civil Procedure 17(b) and 12(b)**

This case must be dismissed as L & Leung does not have legal capacity to sue under Section 1312, which states that:

> "[a] foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees and taxes imposed under the tax law or any related statute, * * *, as well as penalties and interest charges related thereto, accrued against the corporation."

N.Y. Bus. Corp. L. § 1312(a).

Section 1312 "does not raise a jurisdictional bar…Instead, B.C.L. § 1312 affects the legal capacity of a foreign corporation doing business in New York without authorization to maintain an action in New York courts." *Netherlands Shipmortgage Corp., Ltd. v. Madias,* 717 F.2d 731, 735 (2d Cir. 1983) (citations omitted).

When jurisdiction rests on diversity, as it does here, Section 1312 "precludes the maintaining of an action by an unauthorized foreign corporation not only in the state courts of New York but also in the federal courts located in that state." *Madias,* 717 F.2d at 735.

The purpose of Section 1312, which requires corporations doing business in state to pay all fees, penalties and franchise taxes as condition to maintaining any action in state, is to protect domestic corporations from unfair competition and to place them on an equal footing with corporations who are using the facilities provided by the state in the conduct of their business. *See Dixie Dinettes, Inc. v. Schaller's Furniture, Inc.*, 71 Misc.2d 102, 103 (King C'ty 1972).

This Court should also dismiss this action pursuant to Rule 17(b), which governs a corporation's capacity to sue and is subject to Section 1312.  Though the rule "instructs that the capacity of a corporation to sue or be sued is generally determined by the law under which it was organized… this rule is nevertheless subject to the forum state's "door-closing" provisions." *Remsen Partners, Ltd. v. Southern Mgmt. Corp.*, 2004 WL 2210254, at *2 (S.D.N.Y. Sept. 2004); *citing Woods v. Interstate Realty Co*., 337 U.S. 535, 538 (1949) (holding, in a federal diversity action involving a state statute that barred foreign corporations not qualified to transact in-state business from bringing in-state suits, that "where ... one is barred from recovery in the state court [under such a statute], he should likewise be barred in federal court"); *Angel v. Bullington*, 330 U.S. 183, 191-92 (1947) (ruling that a federal court sitting in diversity must apply the forum state's "door-closing" statute).

Alternatively, this Court should dismiss this action pursuant to Rule 12(b), both 12(b)(1) for lack of subject matter jurisdiction and section 12(b)(6) for failure to state claim on the same grounds that L & Leung has no standing to maintain this action based on Section 1312.  *See SD Protection, Inc. v. Del Rio*, 498 F.Supp.2d 576, 581 (E.D.N.Y. 2007) (analyzing Section 1312 as an issue of standing on Rule 12(b)(1) for lack of subject matter jurisdiction); *see also Mayatextil SA v. Liztex USA*, 1993 WL 51094, at *7 (S.D.N.Y. Feb. 24, 1993) (motion to dismiss for lack of legal capacity under Section 1312 was filed pursuant to Rule 12(b)(6)); *see also Hongtai Trading Inc. v. Mingshen Yan*, 2013 WL 1788541, at *2 (E.D.N.Y. Apr. 26, 2013) (dismissing complaint pursuant to Section 1312 on a Rule 12(b)(6) motion).

This Court may review information outside of the complaint in order to make its determination.  *See id*. (considering information cited by movant from plaintiff's website since "the complaint itself does not indicate the extent of Plaintiff's contacts in New York); *see*

*Mayatextil*, 1993 WL 51094, at *7 (stating that while a Rule 12(b)(6) motion to dismiss does not require the court to look beyond the complaint, when discovery has been taken and can be relied upon to make a motion pursuant to Section 1312, the court can consider evidence outside the complaint in deciding the motion to dismiss).

## II.   L & Leung Was Doing Business In New York Within the Meaning of Section 1312

L & Leung was engaged in continuous business activities within the state of New York for over a decade leading up to the time of the filing of the complaint both (1) directly and (2) through agents acting under express authority.  In order for a foreign corporation to be doing business in New York for purposes of Section 1312, "the intrastate activity of a foreign corporation [must] be permanent, continuous, and regular...," a standard which L & Leung's heavy New York commercial activity easily meets.  *Madias*, 717 F.2d at 736.

Doing business within the meaning of Section 1312 does not mean business activities in New York that are "casual or occasional," but rather the activities were "systematic and regular," intrastate in character, and ***essential to the plaintiff's corporate business***."  *Highfill, Inc. v. Bruce & Iris, Inc.*, 50 A.D.3d 742, 744, 855 N.Y.S.2d 635, 637 (2d Dept. 2008) (emphasis added) (citation omitted).  This means "evidence that the corporation has localized some portion of its business activity in New York."  *Madias*, 717 F.2d at 739.

"[N]o precise measure of the nature or extent of [a foreign corporation's] activities [is] determinative of whether a foreign corporation is doing business in New York and each case must be decided on its own facts..." *Madias*, 717 F.2d at 735; *see also Alicanto. S.A. v. Woolverton*, 129 A.D.2d 601, 602, 514 N.Y.S.2d 96 (2d Dept. 1987).

1.      **Leung Was Engaged In Systematic and Continuous Business
        Activities Through Its Agents**

L & Leung was doing systematic and regular business for over a decade and up until the

time the complaint was filed through its agents, Lee & Alfred, Metamorphosis and their various

employees.  Though it was incorporated in Hong Kong, L & Leung cannot hide from the

requirements of Section 1312 when it had a large majority of its business in New York being

carried out by agents working under its control and at its direction.

Relevant authority shows that a foreign corporation who does business in New York

through agents can constitute "doing business" Section 1312.  In *Parkwood Furniture Co., Inc. v.

OK Furniture Co.*, 76 A.D.2d 905, 906 (2d Dept. 1980), the court found that a plaintiff had

violated Section 1312 where it was not authorized to do business in New York but did so through

sales agents in New York.  In *Parkwood*, a foreign corporation maintained two sales agents in

New York, one of which maintained a special telephone number for the corporation's

merchandise.  *See id.*  The corporation did a significant amount of business in New York (i.e. $2

million) during the relevant time.  *See id.*  Further, the court noted that the foreign company's

president came to New York for the purpose resolving issues with the defendant and to solicit

additional sales and called customers in New York to promote sales.  *See id.*  Lastly, the foreign

company retained a repairman in New York City and instructed all dealers handling its

merchandise that the repairman was authorized to do all work for the company with its products.

The court held that "this type of regular, systematic, extensive and continuous business, resulting

in a large volume of sales, both in number and dollar amounts, constituted the doing of business

within the meaning and intent of section 1312 (subd. (a)) of the Business Corporation Law."

In another case with facts very similar to the ones in the instant matter, the Eastern

District of New York found that a Chinese corporation's business activities through a company it

formed specifically for the purposes of carrying out its New York business for its foreign parent triggered Section 1312. *See Hongtai*, 2013 WL 1788541, at *2. YKT, a manufacturer of plastic shopping bags, was a Chinese corporation with its principal place of business in Yin Kou, China. YKT formed a company, Hongtai Trading, Inc., as a New York corporation with its principal place of business in New York "to import and distribute YKT's plastic shopping bags to customers in New York." *Id*. In determining that YKT did regular and continuous business, the court noted that YKT sold merchandise to New York customers through Hongtai, the New York corporation which was specifically "formed as a joint venture for that purpose." *Id*. at 3. The court also considered the fact that YKT had sold bags to New York customers for a number of years prior to the formation of Hongtai and that YKT sold over one million dollars' worth of merchandise to New York companies. *See id*.

Based on *Parkwood* and *Hongtai*, this Court should find that L & Leung was regularly and continuously doing business in New York within the meaning of Section 1312. Like the *Parkwood* and *Hongtai* plaintiffs, L & Leung maintained agents in New York dedicated to the purpose of making sales for the foreign entity. Metamorphosis, like Hongtai Trading, was formed for the express purpose of conducting sales for L & Leung in New York and the United States. L & Leung, like the *Parkwood* plaintiff, sent its executives to New York on a regular basis to conduct business and interact with customers in the New York City office. Like the foreign companies in *Parkwood* and *Hongtai*, L & Leung did a significant portion of its business in New York. In fact, all of its sales resulted from customer meetings at the New York office and taking the facts alleged in the complaint as true, this amounted to $9 million on an annual

basis.[1]  *See* Complaint, ¶ 9.  Like the *Parkwood* plaintiff, L & Leung gave authority to individuals at Metamorphosis to sign contracts and conduct sales on its behalf.

Finally, in making its determination that YKT was doing business in New York under Section 1312, the *Hongtai* court recognized that YKT's sales to New York, even years before the filing of its complaint, were part of its business activities under Section 1312.  *See Hongtai*, 2013 WL 1788541, at *2-3 (counting that YKT made sales in New York even prior to the formation of Hongtai, as early as 4 years prior to the filing of the complaint, as one of the factors in determining that YKT did business pursuant to Section 1312).  Though the relevant timing of the Court's inquiry is focused on the "time the action was commenced," clearly the activities in the years leading up to the filing of the action is a relevant factor, as illustrated by the *Hongtai* decision.  *Mindy Weiss Party Consultants, Inc. v. Carl*, 285 F.Supp. 3d 560, 565 (E.D.N.Y. 2018).  Here, L & Leung has been engaged in a pattern and practice of doing business since 2004 in New York up until the time of the filing of the complaint, without obtaining the necessary certificate of authority from the New York Department of State.  Accordingly, pursuant to Section 1312, this Court should dismiss the instant action.

### 2.    Leung Was Directly Engaged In Systematic and Continuous Business Activities in New York

In addition to engaging in business activities in New York through its agents, L & Leung also directly conducted business in the state on a regular basis.  As set forth above, L & Leung transacted business directly in New York for at least two customer accounts, Belk and Dillard's department stores.  For these accounts, Metamorphosis did not facilitate the sales nor were the monies used to fund Metamorphosis salaries, rent and operating expenses, like the rest of the

---

[1] For the purposes of this motion only, Collection XIIX Ltd. and Nunziata refer to the $9 million as alleged in the Complaint.  Collection XIIX and Nunziata reserve the right to submit its own sales figures if this matter proceeds.

accounts run through Metamorphosis.  Further, L & Leung had an independent employee in New York for six years, doing business for L & Leung with six to twelve customers a year, who had no connection to either Lee & Alfred or Metamorphosis.  In addition to having employees in New York, L & Leung's executives came to the New York City office approximately once or twice a year to perform L & Leung business activities.  L & Leung even advertised for a new VP of Sales and Marketing to employ in New York in and around August 2017.

In assessing whether a company is "doing business" in New York for purposes of Section 1312, a court is to consider "factors including: the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state." *Fashion Fragrance & Cosmetics v. Croddick*, 2003 WL 342273 (S.D.N.Y. 2003).

Courts have routinely held that companies were "doing business" in New York unauthorized in circumstances similar to those present before the Court here.  *See Paper Manuf'rs Co. v. Ris Paper Co. Inc.*, 86 Misc.2d 95 (N.Y. C'ty 1976) (holding that foreign corporation was "doing business" in New York without authorization where it was filling interstate orders from New York companies and promoted its products to New York users); *Highfill*, 50 A.D.3d 742 (holding that foreign corporation was "doing business" in New York unauthorized where executive of company "regularly and continuously solicited potential companies in New York in an effort to persuade the companies to retain the plaintiff"); *Scaffold-Russ Dilworth, Ltd. v. Shared Mgmt. Grp., Ltd.*, 256 A.D.2d 1087 (4th Dept. 1998) (holding that foreign corporation was "doing business" in New York unauthorized where plaintiff engaged in eight transactions over a two-year period and lease a facility in New York); *Conklin Limestone Co., Inc. v. B.A. Linden*, 22 A.D.2d 63 (3d Dept. 1964) (holding that foreign corporation was

"doing business" in New York unauthorized where it received orders directly from New York customers and retail dealers and delivered goods into the state in response); *Croddick*, 2003 WL 342273, at *3 (holding that foreign corporation was "doing business" in New York unauthorized where it solicited business in New York and used a New York City location to collect cash and handle accounts receivable).

It cannot be disputed that L & Leung, completely independently, solicited and maintained clients in New York, reaped profits from its independent business in New York, and hired an employee to assist in carrying out such business.  L & Leung took advantage of the New York City office space for its visiting executives and to host customer meetings multiple times a year, which were a precursor to the placement of purchase orders and the generation of sales.  L & Leung had an HSBC bank account in New York into which monies were directly deposited by customers.  Mark Leung admitted that L & Leung was shipping products, which were solicited at New York customer meetings, as late as July 2017, and L & Leung had import authorization from Dillard's as late as March 2018.  L & Leung regularly and continuously carried on commercial activities that were "essential to [their] corporate business" within the state of New York.  *Highfill*, 50 A.D.3d at 744.  Accordingly, pursuant to Section 1312 and in addition to the additional grounds set forth above, this Court should dismiss the instant action.

**CONCLUSION**

For the foregoing reasons, Collection XIIX Ltd. and Lisa Nunziata respectfully request

that the Court enter an order dismissing the Complaint in its entirety with prejudice.

Dated: September 13, 2019
　　　New York, New York

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By:　　_/s/Elizabeth Viele_____
　　　Brett Berman, Esq.
　　　Elizabeth Viele, Esq.
　　　101 Park Avenue, 17th Floor
　　　New York, New York 10178
　　　Phone: (212) 878-7900
　　　Fax: (212) 692-0940

　　　eviele@foxrothschild.com

　　　_Counsel to Collection XIIX Ltd. and Lisa_
　　　_NunziataMemor_