UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
L & LEUNG LEATHERWARE LTD.,

                          Plaintiff,                               17-cv-7374 (PKC)

      -against-

                                                OPINION
                                         AND ORDER

COLLECTION XIIX LTD. and
LISA NUNZIATA,
                              Defendants.
-----------------------------------------------------------x

COLLECTION XIIX LTD. and
LISA NUNZIATA,

                           Third-Party Plaintiffs,
      -against-

ANDREW LEUNG,

                           Third-Party Defendant.

-----------------------------------------------------------x

CASTEL, U.S.D.J.

           This action arises out of the soured business relationship between plaintiff L &

Leung Leatherware LTD ("L&L"), owned by third-party defendant Andrew Leung and his wife,

and defendant Lisa Nunziata.  The parties at one point cooperated in the designing,

manufacturing, and selling of handbags in the United States.  As profits dwindled in 2016 and

2017, each party had different ideas on how to improve the business model.  Ultimately,

Nunziata and her team ended their relationship with L&L and began working for co-defendant

Collection XIIX LTD ("Collection").  L&L asserts claims of tortious interference with business

relations, unfair competition and business defamation against both Collection and Nunziata, and breach of contract, conversion and money had and received against Nunziata alone.  Collection asserts counterclaims of defamation and tortious interference with business relations against both L&L and Leung, and malicious interference with business relations against L&L.  Nunziata asserts counterclaims of breach of contract, defamation, tortious interference with contract, tortious and malicious interference with business relations, and breach of the implied covenant of good faith and fair dealing against L&L, and breach of fiduciary duty against Leung.  With discovery now closed, L&L (jointly with third-party defendant Leung) moves for summary judgment on all claims and counterclaims asserted.  Nunziata moves for summary judgment on her breach of contract claim, and on the breach of contract, conversion, and money had and received claims asserted by L&L.  For the reasons stated below, each movant's motion is denied, except that L&L's motion for summary judgment as to Nunziata's tortious interference with contract claim will be granted.

BACKGROUND

The business relationship between the parties is complex, lengthy and poorly documented.  L&L is a Hong Kong based company engaged in the design, production and distribution of handbags.  (Pl. 56.1 ¶ 1; Def. 56.1 Resp. ¶ 1.)[1]  The company is owned by Leung and his wife.  (Leung Dep. at 6.)  Sometime in 2006 (the exact date is not clear), Nunziata and L&L began working together.  (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.)  Nunziata designed, marketed, and sold handbags in the United States that L&L either manufactured in its factory in China, or obtained from another foreign factory.  (Id. at 5–6.)  The arrangement resulted in the formation

---

[1] Both the plaintiff and the defendants have filed a Rule 56.1 Statement and a Response in connection with their cross motions for summary judgment.  Citations to the parties' Rule 56.1 Statements are intended as a convenient reference to the evidence cited in those statements.

of a corporation called Metamorphosis, through which Nunziata carried out her design, marketing, and selling.  Nunziata and Leung are each 50% owners of Metamorphosis.  (Doc 90 – Ex. 1.)

Nunziata and L&L formalized the arrangement in 2009 by signing the management agreement that each accuses the other of breaching.  (Doc 80 – Ex. 1 ("Management Agreement").)  The Management Agreement appoints Nunziata as the Vice President of L&L's U.S. office, and empowers her to "represent L&L for its commercial matters regarding its brand and private label business and general administration in U.S."  (Id. at ¶ 3.)  Nunziata agreed to "manage L&L's operation in USA and represent the business transactions of this operation in the interest of L&L."  (Id. at 1.)  L&L agreed "to provide remunerations" according to the compensation and revenue sharing provisions in the agreement.  (Id. at 1.)  The Management Agreement states that it will be valid for a minimum period of 180 months, i.e. 15 years, but confusingly adds that it "shall expire" on December 31, 2015.  (Id. at ¶ 2.)  The agreement specifies that it can be terminated by either party with 90 days written notice.  (Id. at ¶ 14.)  Neither party argues that the agreement expired.

In practice, the relationship worked as follows: Nunziata ran Metamorphosis from a showroom in Manhattan that was paid for by L&L.  There, she and her team designed leather handbag brands and styles, marketed these products, and collected orders from customers.  (Pl. 56.1 ¶ 8; Def. 56.1 Resp. ¶ 8.)  The orders would be passed to L&L, who would manufacture the handbags at its factory in China, or outsource the manufacturing elsewhere.  (Pl. 56.1 ¶ 9; Def. 56.1 Resp. ¶ 9.)  Upon delivery, customers would deliver the checks, which were made payable to L&L, to either Metamorphosis or L&L directly.  (Pl. 56.1 ¶ 10; Def. 56.1 Resp. ¶ 10.)  Metamorphosis would consult with L&L on what to do with received checks, usually depositing

them into an L&L bank account.  (Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶ 11.)  From revenues received,

L&L deducted operating expenses, costs of goods sold, and a percentage of revenues.  (Pl. 56.1 ¶

12; Def. 56.1 Resp. ¶ 12.)   Remaining profit was distributed to Metamorphosis to pay salaries,

commissions, and expenses.  (Pl. 56.1 ¶ 13; Def. 56.1 Resp. ¶ 13.)  Any remaining profits were

split between Nunziata and Leung per the Shareholder Agreement.  (Pl. 56.1 ¶ 14; Def. 56.1

Resp. ¶ 14.)

    Nunziata and L&L operated amicably for several years under the Management

Agreement.  Things changed in 2016 and 2017 when Metamorphosis began incurring losses.

(Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.)  Nunziata suggested to Leung that he look for different

factories which might be able to manufacture the handbags at a lower cost and higher quality.

(Def. 56.1 ¶¶ 30–31; Pl. 56.1 Resp. ¶¶ 30–31.)  Leung sought ways to lower Metamorphosis's

operating expenses.  (Pl. 56.1 ¶ 20; Def. 56.1 Resp. ¶ 20.)  He also expressed a desire to sell his

factory in China, and have L&L focus on "[t]rading, logistic, and chain supply."  (Doc 93 – Ex. 6

at 1.)  Essentially, he wanted L&L to act as a middleman, collecting orders from buyers and

sourcing them to manufacturers.

    Upon hearing of Leung's potential plan to sell the factory in China, Nunziata

raised the idea that she might find a "finance partner" who would finance Metamorphosis's

operations rather than L&L.  (Nunziata Dep. at 57.)  Leung was receptive to this; he anticipated a

finance partner would front the operating expenses of Metamorphosis and make the money back

on Metamorphosis profits, with interest.  (Leung Dep. at 151–53.)

    The crux of the disagreement arises from what happened after this discussion.

L&L and Leung claim that rather than find a finance partner, Nunziata sought to move her entire

design, sales and marketing team to another company who would not only finance operations,

but handle the manufacturing and distribution process and collect all payments—essentially taking the place of L&L.  Nunziata first negotiated with a company called Haskell, but after that deal fell through, she agreed to work for Collection.  (Pl. 56.1 ¶ 41; Def. 56.1 Resp. ¶ 41.) Collection began notifying Metamorphosis and L&L customers that they would be the new vendor of record, and Nunziata and her team began sending notices to customers implying that L&L was "merging" with Collection.  (Pl. 56.1 ¶¶ 49–50; Def. 56.1 Resp. ¶¶ 49–50.)  Nunziata and Collection signed an "Assignment and Assumption Agreement" (Nunziata signed on behalf of "L & Leung Leatherware Limited"), prepared a press release announcing the transaction, and began manufacturing L&L handbag brands.  (Pl. 56.1 ¶¶ 53, 56–57 74–75; Def. 56.1 Resp. ¶¶ 53, 56–57 74–75; Doc 80 – Ex. 23.)  Nunziata never asked Collection to be a finance partner of L&L and/or Metamorphosis.  (Pl. 56.1 ¶ 61; Def. 56.1 Resp. ¶ 61.)  Nunziata and her team are presently compensated by Collection, who funds the expenses and collects the revenues in connection with handbag design, manufacturing and distribution.  (Nunziata Dep. at 294–96.) Sales revenue no longer runs through Metamorphosis or L&L.

Collection and Nunziata view these events in an entirely different light. According to Nunziata, Leung planned to sell his factory and transform L&L into a trading company as part of his retirement plan; he wanted to leave the business entirely.  (Nunziata Dep. at 255–57; Def. 56.1 ¶¶ 34–35; Pl. 56.1 Resp. ¶¶ 34–35.)  Leung was very concerned with Metamorphosis's expenses, and indicated that due to financial struggles he would stop funding the operation after July 1, 2017.  (Def. 56.1 ¶ 40; Pl. 56.1 Resp. ¶ 40.)  Nunziata claims that Leung and L&L were fully aware of her discussions to move her team to another company.  The new company would step into L&L's shoes, paying the operating expenses of Metamorphosis, but likely handling all orders and payments.  (Def. 56.1 ¶¶ 39, 65.)  Had she not found this new

company, Nunziata would be out of a job; L&L had allegedly stopped making rent payments and indicated that it would stop covering the salaries of Metamorphosis staff.  (Def. 56.1 ¶¶ 42, 63; Doc 93 – Ex. 14 at 2.)

L&L asserts that it first learned of the actions of Nunziata and Collection in July 2017, and immediately notified its customers that Collection had not acquired L&L, and that Nunziata did not have authority to sell L&L-owned brands.  (Pl. 56.1 ¶ 67; Def. 56.1 Resp. ¶ 67; Doc 80 – Ex. 34 at 4.)  L&L also sent notice to Collection, threatening legal action if Collection did not dismiss Nunziata, retract the statement indicating that L&L had merged with Collection, and cease infringing on L&L's trademarks.  (Doc 90 – Ex. 19.)  Collection has not notified any customers of L&L's position and continues to employ Nunziata and her team.  (Pl. 56.1 ¶¶ 71–73; Def. 56.1 Resp. ¶¶ 71–73.)

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law. . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' "  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' "  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.' "  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres., 575 F.3d at 204 (internal citation omitted).

DISCUSSION

### A.  The Cross-Motions for Summary Judgment on the Breach of Contract Claims are Denied.

Both L&L and Nunziata move for summary judgment on their breach of contract claims, and L&L has also moved for summary judgment in its favor on Nunziata's claim.  To establish a claim for breach of contract, a plaintiff must prove "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages."

Second Source Funding, LLC v. Yellowstone Capital, LLC, 144 A.D.3d 445, 445–46 (1st Dep't 2016); see also Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 142 (2d Cir. 2011).  Neither party contests the existence of a contract, but this is where the agreement ends.

        L&L asserts that Nunziata breached the Management Agreement clauses requiring her to "manage L&L's operations in the USA and represent the business transactions of this operation in the interest of L&L" and "represent L&L for its commercial matters regarding its brand and private label business."  (Management Agreement at 1–3.)  According to L&L, Nunziata's actions in moving the Metamorphosis business to Collection, advising L&L customers of a purported L&L-Collection merger, and misappropriating checks made out to L&L, constitute a breach of these requirements to act "in the interest of L&L."  (Doc 82 at 24.)  Nunziata does not contest that taken alone, her actions would breach the contract.  Rather, she argues that summary judgment is not appropriate because L&L and Leung were not only aware, but approved of her negotiations with Haskell and Collection.  (Doc 88 at 24.)  In the alternative, Nunziata argues that there was an anticipatory breach of the contract when L&L's ceased funding the expenses of Metamorphosis.

        L&L's motion for summary judgment is denied as material issues of fact exist regarding its awareness of Nunziata's actions.  Certain emails exchanged between the parties indicate that L&L was aware of and approved of Nunziata's goals, such as Leung's March 15, 2017 email to Nunziata acknowledging that she was talking to potential partners "about financing and handling operation."  (Doc 80 – Ex. 3.)  Leung continued to be in the loop on Nunziata's negotiations, expressing concern in an April 13, 2017 email that a deal with Haskell meant that Haskell "will not take over the [New York Office] expense and salary any sooner than July 1, 2017."  (Doc 90 – Ex. 6.)  Still later, he wrote on May 18, 2017 that he was "glad to learn

that things is [sic] moving towards with the Haskell deal . . . I am happy . . . that Haskell will

pass some orders through the trading company and understand it is only part of it." (Doc 93 –

Ex. 18 at 2.) These communications indicate that Leung was at least initially on board with a

new entity stepping into the relationship between Metamorphosis and L&L.

Still, there is evidence that Nunziata withheld information. She never shared the

term sheet of the potential Haskell deal with L&L, even after Leung asked for it. (Nunziata Dep.

at 112–16.) Nunziata likely knew that whoever began financing her team would want to

supplant L&L entirely to reap the maximum benefit. Summary judgment is inappropriate where

"there are any genuine factual issues that . . . may reasonably be resolved in favor of either

party." Anderson, 477 U.S. at 250. This is the case here.

Nunziata argues that L&L's actions in cutting off Metamorphosis funding was an

anticipatory breach of the Management Agreement, thereby defeating L&L's breach of contract

claim. (Doc 88 at 18.) She also brings her own breach of contract claim, arguing that this

conduct was an outright breach. (Doc 92 at 13.) Nunziata points to language in the Management

Agreement requiring L&L to "provide the remunerations as per the below agreement."

(Management Agreement at 1.) The agreement never specifies exactly what is encompassed

within "remunerations" but includes a section devoted to Nunziata's compensation package, id.

at ¶ 5, including an outline of how the profits from Metamorphosis will be split, id. at ¶ 5.3.

Nothing explicitly states that L&L is on the hook for Metamorphosis expenses, particularly at

times when Metamorphosis is not generating any profit. Though L&L paid Metamorphosis

expenses in previous years, it is not obvious that it was contractually bound to do so. Summary

judgment is appropriate only "[w]here the language of the contract is unambiguous, and

reasonable persons could not differ as to its meaning" Rothenberg v. Lincoln Farm Camp, Inc.,

755 F.2d 1017, 1019 (2d Cir. 1985), or if the term is ambiguous, parol evidence would not permit judgment in favor of the nonmovant.  The Court finds that the Management Agreement is ambiguous.  Nunziata asks the Court to interpret the agreement based on the parties' prior course of conduct.  (Doc 92 at 11.)  L&L admits that it paid Metamorphosis expenses in years prior, but asserts that "expenses were intended to be covered by revenues" and when revenues dried up, they ceased funding expenses.  (Def. 56.1 ¶¶ 20, 25; Pl. 56.1 Resp. ¶¶ 20, 25.)  Both interpretations are plausible.  At trial, each party will have an opportunity to support its interpretation of the contract with evidence.  Accordingly, Nunziata's motion for summary judgment on the breach of contract claim is denied.

### B.  The Cross-Motions for Summary Judgment on the Claims of Conversion and Money Had and Received are Denied.

L&L and Nunziata have each moved for summary judgment in their favor on L&L's conversion and money had and received claims.  In late May 2017, Nunziata wrote to Leung explaining that because L&L had stopped paying Metamorphosis expenses, all Metamorphosis credit cards were frozen, impacting Nunziata's personal credit.  (Doc 93 – Ex. 10 at 3.)  Metamorphosis commissions had not been paid, and Nunziata was concerned about payroll.  Leung's son Mark replied explaining that L&L's bank (HSBC) had frozen the account, and that recent sales dollars transferred to the account went towards paying back an HSBC loan, rather than Metamorphosis expenses, credit card debts or sales commissions.  (Id. at 2.)  Recognizing that future payments to L&L would continue to go towards the HSBC debt, Nunziata opened a new bank account at Wells Fargo in the name of "L & Leung Leatherware." (See Nunziata Dep. at 205–10; Pl. 56.1 ¶ 42; Def. 56.1 Resp. ¶ 42.)  She deposited May receivables into this account, rather than the L&L-controlled HSBC account.  (Id.)  The checks she deposited were made payable to "L and Leung Leatherware LTD" and "L & Leung

Leatherware LTD."  (Doc 80 – Ex. 17 at 12–14.)  Nunziata asserts that she only used the funds

for Metamorphosis expenses, rather than her own personal use, and has provided a "Sources and

Uses" spreadsheet listing all credits and debits from the account.  (Doc 90 – Ex. 3 at 52.)

Conversion is the "unauthorized assumption and exercise of the right of

ownership over goods belonging to another to the exclusion of the owner's rights."  Thyroff v.

Nationwide Mut. Ins. Co., 460 F.3d 400, 403–04 (2d Cir.2006) (quoting Vigilant Ins. Co. of Am.

v. Hous. Auth., 87 N.Y.2d 36, 44 (1995)).  "Two key elements of conversion are (1) plaintiff's

possessory right or interest in the property and (2) defendant's dominion over the property or

interference with it, in derogation of plaintiffs rights."  Colavito v. N.Y. Organ Donor Network,

Inc., 8 N.Y.3d 43, 49–50 (2006) (internal citations omitted).  "[A]n action for money had and

received lies when '(1) defendant received money belonging to plaintiff; (2) defendant benefitted

from the receipt of money; and (3) under principles of equity and good conscience, defendant

should not be permitted to keep the money.' "  Panix Promotions, Ltd. v. Lewis, No. 01-cv-2709,

2002 WL 122302, at *2 (S.D.N.Y. Jan. 22, 2002) (quoting Aaron Ferer & Sons Ltd. v. Chase

Manhattan Bank, Nat. Ass'n, 731 F.2d 112, 115 (2d Cir. 1984)).

The motions will be denied.  Nunziata argues that she did not use the funds for

her benefit, nor take personal control over them.  The account was in L&L's name, and the funds

were used as L&L should have used them.[2]  The record is unclear on this point.  Her "Sources

and Uses" document, attached as an exhibit to an expert report (Doc. 90 – Ex. 3 at 52), has

---

[2] Nothing in the record contains the exact name on the account.  At her deposition, Nunziata admitted that it was "an account that I opened under L & Leung Leatherware." (Nunziata Dep. at 205.)  She stated that she believed she was entitled to open the account as she "signed many documents on behalf of L & Leung, and I was acting president of L & Leung." (Id. at 207.)  It is not clear if she is referring to L and Leung Design Group, or L&L – when specifically asked, she said "there were many different names that Mr. Leung used.  So as L & Leung, whether they were Leatherware Limited or something else, I signed, but I signed many documents." Id.  The checks that she deposited were made payable to either "L & Leung Leatherware LTD" or "L and Leung Leatherware LTD." (Doc 80 – Ex. 17 at 12–14.)

entries for commissions due to her, and repayment of a loan that it appears she personally issued. This could plausibly be a benefit received from the funds, though the document does not make it clear if the funds were used to cover these line entries.  The parties also dispute whether Nunziata had authority to open an account in L&L's name, given her alleged position as "acting president of Leung Leatherware."  (Pl. 56.1 ¶ 45; Def. 56.1 Resp. ¶ 45.)  At the very least, Nunziata knew that L&L did not consent to the Wells Fargo account; when an L&L accountant asked about a late payment from customer Christopher and Banks, Nunziata stated that Christopher and Banks was "on the watch list for bankruptcy" and that "I understand they are paying late." (Doc 80 – Ex. 16 at 3.)  In reality, the money had already been deposited into the Wells Fargo account.  (Doc 80 – Ex. 14.)  At trial, the fact finder will determine if Nunizata had the authority for her actions or if those actions amounted to an actionable wrong.

Nunziata also argues that these claims are duplicative of the breach of contract claim.  See Fraser v. Doubleday & Co., 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984) (Sand, J) ("[T]o sustain a conversion claim, a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights."); Dessert Beauty, Inc. v. Platinum Funding Corp., 519 F. Supp. 2d 410, 420 (S.D.N.Y. 2007) ("where a valid contract exists between the parties regarding the issue at dispute, a quasi-contractual theory, such as money had and received, cannot be maintained.").  Because the Court has denied summary judgment on the breach of contract claim, the Court declines to decide at this juncture whether these actions are subsumed by the breach of contract claim.  At trial, the Court reserves the right to enter a judgment as a matter of law at the close of evidence.

C.  The Motions for Summary Judgment on the Claims of
Interference with Business Relations and
<u>Unfair Competition are denied.</u>

L&L asserts claims of tortious interference with business relations and unfair

competition against both Collection and Nunziata.  Collection brings counterclaims of tortious

interference with prospective business relations against both L&L and Leung, and malicious

interference against L&L only.  Nunziata brings a counterclaim of malicious interference with

prospective business relations against L&L.  L&L and Leung have moved for summary

judgment as to the claims and all counterclaims.

"To prevail on a claim for tortious interference with business relations . . . under

New York law, a plaintiff must show that '(1) the plaintiff had business relations with a third

party; (2) the defendant interfered with those business relations; (3) the defendant acted for a

wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts

injured the relationship.' "  <u>16 Casa Duse, LLC v. Merkin</u>, 791 F.3d 247, 261 (2d Cir. 2015)

(quoting <u>Catskill Dev., LLC v. Park Place Entm't Corp.</u>, 547 F.3d 115, 132 (2d Cir. 2008)).

These elements are not different when the business relations are prospective.  <u>See</u> <u>Nadel v. Play-</u>

<u>By-Play Toys & Novelties, Inc.</u>, 208 F.3d 368, 382 (2d Cir. 2000).  Nor do the elements differ

when the claim is phrased as malicious interference.  <u>See</u> <u>Sound City Electronics Corp. v. R.B.C.</u>

<u>Radio, Inc.</u>, No. 99-cv-9309, 2002 WL 15639, at *9, n.7 (S.D.N.Y. Jan. 7, 2002) (Chin, J)

("Defendants allege intentional, tortious, and malicious interference; '[w]hatever the most apt

rubric may be, the elements of the tort are the same.' ") (quoting <u>Martin Ice Cream, Co. v.</u>

<u>Chipwich, Inc.</u>, 554 F. Supp. 993, 945 (S.D.N.Y. 1983)).

The " 'wrongful means' element sets a high bar . . . [it] requires a plaintiff to

show, 'as a general rule,' that 'the defendant's conduct . . . amount[ed] to a crime or an

13

independent tort.' " 16 Casa Duse, 791 F.3d at 262 (quoting Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004)).[3]  A defendant acting in its "normal economic self-interest" is not enough, even if the defendant was "indifferent to the plaintiff's fate." Id.

Unfair competition is a similar tort.  "The essence of an unfair competition claim is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." Forschner Grp., Inc. v. Arrow Trading Co., 124 F.3d 402, 408 (2d Cir. 1997).  It requires "(1) likelihood of confusion and (2) bad faith on the part of the defendants." Lopez v. Gap. Inc., 883 F. Supp. 2d 400, 430 (S.D.N.Y. 2012).

The conduct underlying these claims are the notifications that each party sent to L&L customers.  After the deal between Nunziata and Collection was finalized, two employees on Nunziata's team sent email notifications to Metamorphosis and L&L customers about the transaction.  (See Doc 80 – Exs. 19 and 22.)  Most of the emails contained the phrase "We are merging with Collection XXIII" and came from an employee purporting to work for "L and Leung Design Group" rather than L & Leung Leatherware LTD.  (See Doc 80 – Ex. 19.) Nunziata asserts that "L and Leung Design Group" is a name that Metamorphosis did business under, and is not L & Leung Leatherware LTD.  (Nunziata Dep. at 80–83.)  However, one customer was explicitly notified that "L & Leung Leatherware LTD will no longer be in business as of July 1, 2017."  (Doc 80 – Ex. 22 at 4.)  Collection and Nunziata also circulated a press release to customers stating that "Collection 18 . . . has reached a definitive agreement to acquire

---

[3] The Court recognizes that New York courts apply an exception to this principle where a defendant acts "for the sole purpose of inflicting intentional harm on plaintiffs." NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc., 215 A.D.2d 990, 990 (3d Dep't 1995).  Neither side cites to evidence that would support a conclusion that the parties did not act in their own self-interest.

the assets of L and Leung Design Group." (Doc 80 – Ex. 27 at 3.) In response, on July 17, 2019,

L&L sent letters to the customers stating that L&L was still in business, and that Nunziata had no

authority to sell any L&L assets, and was not the president of "L and Leung Design Group."

(Doc 80 – Ex. 34 at 4.)

Viewing the evidence in the light most favorable to the nonmovant, L&L's

motion for summary judgment on these claims will be denied. There are a plethora of genuinely

disputed facts that preclude the Court from concluding, as a matter of law, that either party has

acted in bad faith or done anything amounting to the "high bar" of improper conduct. Leung

admitted a desire to turn L&L into a trading operation, and was aware that Nunziata was

negotiating with potential partners who might not see a use for L&L moving forward. (See

Leung Dep. at 104; Doc 90 – Ex. 6 (emails between Leung and Nunziata acknowledging that

Haskell "do[es] not want or need a trading partner. . . ."). He was also aware that Nunziata held

herself out as President of "L and Leung Design Group"; in fact, the L&L website listed her as

such. (Doc 90 – Ex. 8.) At the same time, Nunziata admitted that certain communications with

customers about the Collection deal were "a botch job." (Nunziata Dep. at 285.) She also

withheld the full extent of her negotiations. (Id. at 114–16.) On this record, the Court cannot say

that either party's customer communications amount to tortious interference with business

relations or unfair competition.[4]

---

[4] There is also an issue of material fact regarding Collection's liability. L&L asserts that Collection is liable under respondent superior. Such a theory requires that the "employee [] be performing some act in furtherance of a duty he owes the employer and where the employer is, or could be, exercising some control, directly or indirectly, over his activity." Johnson v. Daily News, Inc., 34 N.Y.2d 148, 149 (1974). Here, Nunziata and Collection never signed an employment agreement, and so it is difficult to deduce when, if at all, Nunziata became Collection's agent or employee. They signed an "Assignment and Assumption Agreement" on June 29, 2017, but this is after much of the conduct underlying these claims occurred. (See Doc 80 – Ex. 23.) Nunziata also signed on behalf of L and Leung Leatherware LTD, indicating that Collection may have thought it was dealing with L&L and Leung directly, and not Metamorphosis.

15

D. The Motions for Summary Judgment on the
Defamation Claims are Denied.

L&L has moved for summary judgment on its business defamation claim and on

the defamation counterclaims asserted by Collection and Nunziata.[5]  The basis for these claims is

the same customer communications described above.

"In New York, [d]efamation is 'the making of a false statement which tends to

expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion

of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in

society.' " Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017) (quoting Foster v.

Churchill, 87 N.Y.2d 744, 751 (1996)).  "To state a claim for defamation, a complaint must

allege '(1) a false statement that is (2) published to a third party (3) without privilege or

authorization, and that (4) causes harm, unless the statement is one of the types of publications

actionable regardless of harm.' " Id. (quoting Stepanow v. Dow Jones & Co, 120 A.D.3d 28,

41–42 (1st Dep't 2014)).

For largely the same reasons underlying the denial of the motion for summary

judgment on the tortious interference claims, L&L's motion will be denied.  There are genuine

---

[5] L&L pleaded this action as "trade libel" in the Complaint.  (See Compl. at ¶¶ 52–55.)  In the moving papers, each party refers to the claim as one for business defamation.  The Court proceeds under that rubric, but notes that although trade libel and defamation are very similar claims, there are slight differences:

> Under New York law, "[t]rade libel or product disparagement is an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value or quality of a product or property." Angio–Med. Corp. v. Eli Lilly & Co., 720 F. Supp. 269, 274 (S.D.N.Y.1989).  Like defamation, trade libel is based on an injurious falsehood published to a third party.  Ruder & Finn Inc. v. Seaboard Sur. Co., 52 N.Y.2d 663, 670 (1981).  However, whereas defamation (in the commercial context) entails a statement that "impugns the basic integrity or creditworthiness of a business," trade libel is based on statements "confined to denigrating the quality of a business' services [or products]." Ehrenkranz v. 58 MHR, LLC, 47 Misc.3d 1226(A), 18 N.Y.S.3d 578 (Sup. Ct. Suffolk Cty. 2015) (table decision) (emphasis added).

Enigma Software Grp. USA, LLC v. Bleeping Computer LLC, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016) (Engelmayer, J).

disputes as to the falsity of the statements, and as to L&L's desire to remain in the business of handbag manufacturing and distribution.  Nunziata and Collection have come forward with evidence that "L and Leung Design Group" was how Metamorphosis did business.  At one point the L&L website listed Nunziata as President of "L and Leung Design Group."  (Doc 90 – Ex. 8.)  There are also emails indicating that L&L planned to cut off all funding of Metamorphosis, and expected a new company to foot the expenses beginning in July 2017.  (See e.g., Doc 93 – Ex. 17–18.)  Still, Nunziata withheld the full extent of her negotiations from L&L, likely knowing that it would be unhappy with the result.  L&L also sent emails to Nunziata that appear to evince a desire to remain in business.  (See Doc 93 – Ex. 20 at 2 "we do remain interested in moving into trading operations and licensing out Emma Fox. . . .")  At least one of parties' written statements is true—either "L and Leung Design Group" merged with Collection, or Nunziata had no authority to speak for "L and Leung Design Group," and so no merger occurred. The issue will be up to the fact finder to decide.[6]

### E.  The Motion for Summary Judgment on the Breach of the Implied Covenant of Good Faith and Fair Dealing Claim is Denied.

L&L moves for summary judgment in its favor on Nunziata's claim of breach of the implied covenant of good faith and fair dealing.  Nunziata alleges that L&L breached the implied covenant when it unilaterally chose to slow factory production and take fewer Metamorphosis orders.  L&L's motion will be denied.

---

[6] Though defendants argue that the statements alleged to have been made by them do not constitute defamation *per se*, this argument is irrelevant.  Under New York law, plaintiffs alleging defamation must plead "special damages" which "contemplate the loss of something having economic or pecuniary value."  Liberman v. Gelstein, 80 N.Y.2d 29 at 434–35 (1992).  Certain categories of defamation, labeled defamation *per se* are able to avoid this requirement. Plaintiff has alleged special damages.  (See Compl. at ¶ 54.)

In New York, all contracts contain an implied "covenant of good faith and fair dealing in the course of contract performance." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995). Included within the covenant of good faith and fair dealing are "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Id. (citation omitted). One of these promises is that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (citation omitted). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Id.

L&L argues that it is "undisputed" that it did not wind down its ability to fulfill orders. This is not the case. Leung stated that he had plans to shut down his factory. (See Doc 93 – Ex. 6.) Though it appears that he never did, in 2017, certain orders were routed to different factories because his was unavailable. (Leung Dep. at 135–37.) L&L also argues that Nunziata's claim is subsumed by her breach of contract claim. See Fleisher v. Phoenix Life Ins. Co., 858 F. Supp. 2d 290, 298-99 (S.D.N.Y. 2012) ("A party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim.") On this murky record, the Court is unable to grant L&L's motion.

### F.   The Motion for Summary Judgment on the Breach of Fiduciary Duty Claim is Denied.

Leung moves for summary judgment in his favor on Nunziata's breach of fiduciary duty claim. Nunziata claim asserts that as a 50% owner of Metamorphosis, Leung breached his fiduciary duties ("good faith, fairness, and loyalty") to Nunziata by causing L&L to

breach the Management Agreement and cease funding Metamorphosis.  His motion will be denied.

Under New York law, "[t]he shareholders in a closely held corporation share a fiduciary duty among themselves."  Benson v. RMJ Securities Corp., 683 F. Supp. 359, 374 (S.D.N.Y. 1988) (collecting cases).  This includes "a duty to deal fairly, in good faith, and with loyalty."  Id. at 375 (citation omitted).  "The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct."  Rut v. Young Adult Inst., Inc., 74 A.D.3d 776, 777 (2d Dep't 2010) (citation omitted).

There is a genuine dispute as to whether Leung breached any duties owed to Nunziata.  As explained earlier, the Management Agreement does not impose an unambiguous obligation upon L&L to pay all Metamorphosis expenses.  If L&L was contractually obligated to fund Metamorphosis, and Leung cut off this funding in the face of dwindling profits, a reasonable fact finder could plausibly find him liable for breach of fiduciary duty.  Accordingly, his motion for summary judgment is denied.

### G.  The Motion for Summary Judgment on the Tortious Interference with Contract Claim is Granted.

Finally, L&L has moved for summary judgment in its favor on Nunziata's claim of tortious interference with her employment contract.  The elements of tortious interference with contract are "(i) the existence of a contract; (ii) defendants' knowledge of that contract; (iii) defendants' intentional inducement of a breach of that contract; (iv) a breach; (v) but for the defendants' actions, that contract would not have been breached; and (vi) damages."  Conte v. Emmons, 895 F.3d 168, 171 (2d Cir. 2018).

19

L&L's motion for summary judgment will be granted.  First, there is no executed employment contract between Nunziata and Collection in the record.  There appears to have been a draft agreement at one point, but it was never executed.  (Nunziata Dep. at 293–94.) Absent a contract, New York law recognizes a tortious interference claim in the at-will employment context.  However, the claimant must show that the "third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats . . . or that the defendant acted with malice."  Albert V. Loksen, 239 F.3d 256, 274 (2d Cir. 2001).  Nunziata has not made a showing that L&L's July 24, 2017 letter to Collection reaches this threshold.  The letter does not refer to any purported employment agreement; it takes aim at the Assignment and Assumption Agreement for which Nuniziata signed on behalf of L&L.  (See Doc 90 – Ex. 19.) Further, there was no contractual breach.  Nunziata remains employed at Collection.  (Nunziata Dep. at 295.)  Without a breach of a contract, the claim for tortious interference with contract fails.  See Oddo Asset Mgmt. v. Barclays Bank PLC, 19 N.Y.3d 584, 595 (2012) ("Since there was no underlying breach of contract, [plaintiff's] tortious interference claim . . . fails."); see also NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc., 87 N.Y.2d 614, 623 (1996).  No reasonable fact finder could find that L&L tortuously interfered with Nunziata's employment contract. Accordingly, the motion for summary judgment is granted.

CONCLUSION

For the reasons explained, L&L's motion for summary judgment is GRANTED as to Nunziata's claim for tortious interference with contract and otherwise DENIED.  Nunziata's motion for summary judgment is DENIED in its entirety.  The Clerk is directed to terminate the relevant motions.  (Docs 79, 91.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
         March 16, 2021